Clair Leonard (Bar No. 346232)
Email: clair@coastkeeper.org
Sarah J. Spinuzzi (Bar No. 305658)
Email: sarah@coastkeeper.org
INLAND EMPIRE WATERKEEPER
ORANGE COUNTY COASTKEEPER
3151 Airway Avenue, Suite F-110
Costa Mesa, California 92626
Telephone: (714) 850-1965
*Attorneys for Plaintiffs Inland Empire Waterkeeper and Orange County Coastkeeper*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| INLAND EMPIRE WATERKEEPER, a program of Orange County Coastkeeper; ORANGE COUNTY COASTKEEPER, a California nonprofit public benefit corporation,<br><br>Plaintiffs,<br>v.<br><br>ANGELUS BLOCK CO. INC., a corporation; MEA MANUFACTURING PROPERTIES, LLC, a limited liability company,<br><br>Defendants. | Civil Case No. 8:26-cv-91<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.*)** |

Plaintiffs Inland Empire Waterkeeper and Orange County Coastkeeper (collectively, "Plaintiffs" or "Waterkeeper"), by and through counsel, hereby allege:

## I. <u>JURISDICTION AND VENUE</u>

1. Plaintiffs bring this civil suit under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* (the "Clean Water Act" or the "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201

(an action for declaratory and injunctive relief arising under the Constitution and laws of the United States). The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

2. On November 11, 2025, Plaintiffs issued a 60-day Notice of Violation and Intent to Sue letter (the "Notice Letter"), attached hereto as **Exhibit A** and fully incorporated by reference herein, to Angelus Block Co. Inc. ("Angelus Block") and Mea Manufacturing Properties, LLC ("Mea Manufacturing") (collectively, "Defendants") as the owner(s) and/or operator(s) of the Angelus Block facility located at 3435 S. Riverside Ave, Rialto, CA 92316 ("Facility"). The Notice Letter informed Defendants of the violations of California's General Permit for Discharges of Storm Water Associated with Industrial Activities (the "General Permit") (*National Pollution Discharge Elimination System* ("NPDES") *General Permit No. CAS000001, Water Quality Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ, as amended by Order No. 2015-0122-DWQ, as subsequently amended by Order 2018-0028-DWQ in 2018 (effective July 1,2020*) (hereinafter, the "General Permit") and the Clean Water Act at the Facility. The Notice Letter informed Defendants of Plaintiffs' intent to file suit to enforce the General Permit and the Clean Water Act ("CWA").

3. The Notice Letter was also sent to the Attorney General of the United States Department of Justice ("USDOJ"), the Administrator of the United States Environmental Protection Agency ("EPA"), the Acting Regional Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, Santa Ana Region ("Santa Ana Regional Board" or "Regional Board"), as required by 40 C.F.R. § 135.2(a)(1) (as amended, March 19, 1991) and CWA § 505(b), 33 U.S.C. § 1365(b)(1)(A).

4. Sixty days have passed since the Notice Letter was sent via certified mail to

Defendants and the State and Federal agencies. Plaintiffs are informed and believe, and thereon allege, that neither the EPA, USDOJ, nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this Complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under CWA § 309(g). 33 U.S.C. § 1319(g).

5. Venue is proper in the Central District of California pursuant to CWA § 505(c)(1), 33 U.S.C. § 1365(c)(1), because the violation source is located within this judicial district.

6. Plaintiffs seek relief for Defendants' substantive and procedural violations of the General Permit and the CWA resulting from industrial activities at the Facility.

## II. <u>INTRODUCTION</u>

7. This Complaint seeks relief for the Defendants' unlawful discharges of pollutants into waters of the United States from their industrial operations at the Facility. Specifically, Waterkeeper is informed and believes, and thereon alleges, that Defendants' Facility discharges pollutants to the Santa Ana River, which then flows to the Pacific Ocean (collectively referred to as the "Receiving Waters"), in violation of the substantive and procedural requirements of the General Permit and the CWA. These violations have been occurring since at least November 11, 2020, and are ongoing and continuous.

8. With every significant rainfall event, large amounts of polluted storm water, originating from industrial operations like Defendants' Facility, pour into storm drains and local waterways. The consensus among regulatory agencies and water quality specialists is that storm water pollution accounts for a significant amount of total pollution entering surface waters each year. These surface waters, known as "Receiving Waters," are ecologically sensitive areas. These waters are essential habitat for dozens of fish and bird species, as well as macro-invertebrate and invertebrate species. Storm water and non-storm water contain sediment, heavy metals (i.e. aluminum, iron, magnesium, chromium, copper, lead, mercury, nickel, zinc, high concentrations of nitrate and nitrite), and other

pollutants. Polluted storm water runoff diminishes the special aesthetic and recreational value that surface waters provide to surrounding communities. Public use of surface waters exposes many people to toxic metals and other contaminants present in storm water and non-storm water discharges. Polluted discharges to surface waters, such as the Receiving Waters, also impair non-contact recreational and aesthetic opportunities, like wildlife observation.

## III. PARTIES

### A. Inland Empire Waterkeeper and Orange County Coastkeeper

9. Inland Empire Waterkeeper is a program of Orange County Coastkeeper. Founded in 1999, Orange County Coastkeeper is a nonprofit public benefit corporation organized under the laws of the State of California with its office located in Costa Mesa, California. Inland Empire Waterkeeper's office is located at 6876 Indiana Avenue, Suite D, Riverside, California 92506. Together, Inland Empire Waterkeeper and Orange County Coastkeeper have over 8,220 members who live and/or recreate in and around the Santa Ana River watershed.

10. Waterkeeper's mission is to protect and enhance the water quality of the Upper Santa Ana River Watershed through programs of advocacy, education, research, restoration, and enforcement. Waterkeeper actively seeks federal and state agency implementation of the CWA and, when necessary, directly initiates enforcement actions on behalf of itself and its members.

11. Waterkeeper members enjoy the waters that storm water from the Facility discharges into, including the Santa Ana River. Waterkeeper members use these waterways to participate in a variety of water sports and other activities including fishing, swimming, boating, kayaking, bird watching, viewing wildlife, hiking, biking, surfing, wading, standup paddle boarding, walking, running, and engaging in scientific study, including monitoring, restoration, and research activities. The discharge of pollutants from the Facility negatively impacts and harms Waterkeeper members' use and enjoyment of

the Receiving Waters.

12. Defendants' failure to comply with the procedural and substantive requirements of the CWA and General Permit, including (1) discharging polluted storm water from the Facility, (2) failing to report such pollution, and (3) failing to improve the quality of storm water discharges from the Facility in accordance with the General Permit, degrades water quality and harms aquatic life in the Receiving Waters. Further, such actions and/or inaction impairs Waterkeeper members' use and enjoyment of those Receiving Waters, thus giving Plaintiffs standing on behalf of its members.

13. The violations of the CWA and General Permit at the Facility are ongoing and continuous. Thus, the interests of Waterkeeper's members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the CWA and General Permit. The relief sought herein will redress the harms to Plaintiffs' members caused by Defendants' activities.

14. Defendants' failure to comply with the procedural requirements of the CWA and General Permit means that Waterkeeper's members are unable to obtain statutorily required information on Defendants' storm water and storm water management practices. Thus, Plaintiffs face both informational harm and informational injury because the CWA and General Permit provide a right to information, but Defendants have often failed to provide such information, as detailed below. Further, such informational harm and injury give Plaintiffs standing on behalf of its members.

15. The ongoing acts and omissions alleged herein will irreparably harm Plaintiffs' members, and no plain, speedy, or adequate remedies at law exist for these harms.

**B. The Owner(s) and/or Operator(s) of the Facility**

16. In the Facility's Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity dated June 26, 2015 ("2015 NOI"), Angelus Block is named as the operator of the facility itself.

17. On information and belief, Waterkeeper alleges that since at least November 11, 2020, Angelus Block owned and operated the Facility.

18. Angelus Block is a corporation formed in California and is registered to do business in California.

19. Angelus Block's registered agent for service is Edward M. Antonini, 11374 Tuxford St, Sun Valley, CA 91352.

20. Information available to Waterkeeper indicates that the real property underlying the Facility is owned by Mea Manufacturing and leased to Angelus Block.

21. Property owners with knowledge and control of the activities giving rise to a CWA claim are liable for those violations.

22. On information and belief, Waterkeeper alleges that Mea Manufacturing has knowledge and control of the actions giving rise to the Facility's General Permit and CWA violations through various land leases, subleases, and memorandums of understanding related to the real property giving rise to the claims below.

23. Waterkeeper alleges that Angelus Block and Mea Manufacturing are both responsible parties under the Clean Water Act.

## IV. LEGAL BACKGROUND

### A. The Clean Water Act

24. Clean Water Act § 301(a), 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, CWA § 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to CWA § 402, 33 U.S.C. §§ 1311(a), 1342(b).

25. The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1) (as amended, January 4, 2021).

26. The "discharge of a pollutant" means, among other things, "any addition of

any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2 (as amended, June 22, 2020).

27. The term "pollutant" includes "dredged spoil, solid waste… rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2 (as amended, June 22, 2020).

28. The EPA promulgated regulations defining "waters of the United States." *See* 40 C.F.R. § 120.2 (as amended, September 8, 2023). The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, and wetlands adjacent to navigable waters. *Id.* In *Sackett v. Environmental Protection Agency*, the US Supreme Court constricted the EPA's interpretation of waters the United States, holding that the CWA extends to only wetlands that are "as a practical matter indistinguishable from waters of the United States." The Court then stated:

> This requires the party asserting jurisdiction to establish "first, that the adjacent [body of water constitutes] ... 'water[s] of the United States' (*i.e.*, a relatively permanent body of water connected to traditional interstate navigable waters); and second, that the wetland has a continuous surface connection with that water, making it difficult to determine where the 'water' ends and the 'wetland' begins."

*Sackett v. EPA*, 598 U.S. 651, 678-679 (2023) (citing *Rapanos v. U.S.*, 547 U.S. 715, at 755, 742 (2006)).

29. CWA §§ 505(a)(1) and 505(f) provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i), 1365(f).

30. Defendants are each "persons" within the meaning of CWA § 502(5). *See* 33 U.S.C. § 1362(5).

31. A third-party enforcement action for injunctive relief is authorized under CWA § 505(a) of the Clean Water Act. *See* 33 U.S.C. § 1365(a).

32. Each separate violation of the CWA subjects the violator to a penalty up to $68,445 per day per violation for all violations that occurred after November 2, 2015, and were assessed on or after January 8, 2025. *See* 33 U.S.C. §§ 1319(d), 1365(a); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (as amended, January 8, 2025).

33. Clean Water Act § 505(d), 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys', experts', and consultants' fees.

**B. California's General Permit**

34. CWA § 402(p) establishes a framework for regulating industrial storm water discharges under the NPDES permit program. 33 U.S.C. § 1342(p).

35. CWA § 402(b) allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. *See* 33 U.S.C. § 1342(b). States with approved NPDES permit programs are authorized by CWA § 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial storm water dischargers. *See id.*

36. The EPA authorizes the state of California to issue NPDES permits.

37. In California, the State Board is charged with regulating pollutants to protect California's water resources. *See* Cal. Water Code § 13001.

38. The General Permit is a statewide general NPDES permit issued by the State Board pursuant to the CWA.

39. The General Permit was issued on July 1, 2015, pursuant to Order No. 2014-0057-DWQ.

40. On November 6, 2018, the State Board amended the General Permit with Order No. 2015-0122-DWQ, incorporating: (1) the Federal Sufficiently Sensitive Test Method Ruling; (2) TMDL Implementation Requirements; and (3) Statewide Compliance

Options Incentivizing On-Site or Regional Storm Water Capture and Use.

41. To lawfully discharge storm water to waters of the United States in California, industrial dischargers must secure coverage under the General Permit and comply with its terms or obtain and comply with an individual NPDES permit. *See* General Permit Finding 12.

42. Prior to beginning industrial operations, dischargers must apply for coverage under the General Permit by submitting a NOI to the State Board. *See id.* Finding 17.

43. Violations of the General Permit are violations of the CWA. *See id.* § XXI(A).

**C. The General Permit's Technology-Based Effluent Limitations**

44. The General Permit Effluent Limitations require dischargers covered by the General Permit to reduce or prevent pollutants associated with industrial activity in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. *Id.* § V(A). Toxic pollutants include copper, lead, and zinc, among others. 40 C.F.R. § 401.15 (as amended, April 21, 2020). Conventional pollutants include biochemical oxygen demand ("BOD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, and fecal coliform. 40 C.F.R. § 401.16 (as amended, April 21, 2020).

45. Pursuant to the CWA and the General Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); General Permit § V(A).

46. EPA's 2015 NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks"), which are, in part, incorporated into the General Permit via the Numeric Action Levels ("NALs") set forth in Table 2. General Permit § XI(B).

47. The EPA Benchmarks provide an objective standard to determine whether a facility's BMPs are successfully developed and/or implemented and achieve compliance with BAT and BCT standards. *Id.* § V(A); *see* EPA's NPDES MSGP, Fact Sheet at 106; *see also*, 65 Federal Register 64839 (2000).

48. The EPA Benchmarks for the following parameters are as follows: pH – 6.0-9.0 standard units ("s.u."); TSS – 100 mg/L; O&G – 15 mg/L; zinc ("Zn") – 0.26 mg/L; aluminum ("Al") – 0.75 mg/L; and copper ("Cu") – 0.0332 mg/L.

49. The General Permit establishes annual NALs and instantaneous maximum NALs. The following annual NALs have been established under the General Permit: TSS – 100 mg/L; O&G – 15 mg/L; Zn – 0.26 mg/L; Al – 0.75 mg/L; and Cu – 0.0332 mg/L. An exceedance of an annual NAL occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL. The reporting year runs from July 1 to June 30. The General Permit also establishes the following instantaneous maximum NALs: pH – 6.0-9.0 s.u.; TSS – 400 mg/L; and O&G – 25 mg/L.

50. Discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks or NALs indicate that BMPs that meet BAT for toxic pollutants and/or BCT for conventional pollutants have not been developed and/or implemented at the Facility.

### D. The General Permit's Storm Water Pollution Prevention Plan Requirements

51. Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") prior to conducting and to continue industrial activities. General Permit § X(B). The SWPPP must meet all the requirements of the General Permit. *Id.* §§ X(A)-(H), App. 1. The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. *Id.* § X(G).

52. The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges. *Id.* § X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. *Id.* § X(C).

53. The SWPPP must include: a narrative description and summary of all industrial activity; potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized NSWDs; the identification and elimination of NSWDs; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and an identification and description of individuals and their current responsibilities for developing and implementing the SWPPP. *Id.* § X.

54. The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. *Id.*

55. The General Permit requires a discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the General Permit. *Id.* §§ X(A)-(B).

56. The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. *Id.* § X(B)(1).

**E. The General Permit's Monitoring Requirements**

57. The General Permit requires permittees to develop and implement a storm water Monitoring Implementation Plan ("MIP") and include it in the SWPPP prior to conducting and to continue industrial activities. *Id.* §§ X(I), XI.

58. The General Permit requires facility owners and/or operators to develop and implement an adequate MIP that meets all the requirements of the General Permit. *Id.* §§ X(I), XI(A)-(D).

59. The objective of the MIP is to detect and measure the concentrations of pollutants in a facility's discharge and to ensure compliance with the General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. *See id.* § XI.

60. An adequate MIP ensures that BMPs are effectively reducing and/or eliminating pollutants at the facility; an MIP is evaluated and revised whenever appropriate to ensure compliance with the General Permit. *See id.*

61. The General Permit requires facility operators to monitor and sample storm water discharges to ensure that a facility is complying with the terms of the General Permit. *Id.* § XI(B).

62. General Permit § XI(A)(1) requires dischargers to conduct monthly visual observations during dry weather of each drainage area. Monthly visual observations must include observations of any NSWDs, all outdoor industrial equipment and activities, BMPs, and all potential sources of pollution.

63. General Permit § XI(A)(2) requires dischargers to conduct visual observations at the same time sampling occurs at a discharge location, and document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, odor in the discharge, and the source of any pollutants in storm water discharges from the facility.

64. Dischargers are required to maintain records of observations, observation

dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. *See id.* § XI(A)(3).

65. The General Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. *Id.* § XI(B)(4).

66. General Permit § XI(B)(1) defines a Qualifying Storm Event ("QSE") as a precipitation event that produces a discharge for at least one drainage area, and it is preceded by forty-eight hours with no discharge from any drainage area.

67. The General Permit requires dischargers to collect and analyze storm water samples from at least two QSEs within the first half of each reporting year (July 1 to December 31), and two QSEs within the second half of each reporting year (January 1 to June 30). *Id.* § XI(B)(3).

68. Storm water samples must be analyzed for, *inter alia*, TSS, pH, O&G, additional parameters identified on a facility-specific basis that serves as indicators of the presence of all industrial pollutants identified in the pollutant source assessment, and those required under a facility's Standard Industrial Classification ("SIC") code. *Id.* § XI(B)(6).

69. Table 1 of the General Permit requires dischargers with SIC code 3271 (concrete and brick) to additionally analyze storm water samples for Fe.

70. General Permit § XI(B)(11), among other requirements, provides that permittees must submit all sampling and analytical results for all samples via SMARTS within thirty days of obtaining all results for each sampling event.

**F. The General Permit's Exceedance Response Actions Requirements**

71. Under the General Permit, facility operators are required to perform Exceedance Response Actions ("ERAs") as appropriate whenever sampling indicates NAL exceedances.

72. An annual NAL exceedance occurs when the average of all the analytical results for a parameter from samples taken within a reporting year exceeds the annual

NAL value for that parameter.

73. An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value or are outside of the instantaneous maximum NAL range for pH. *Id.* § XII(A).

74. Upon receiving NOI coverage, all permittees are deemed in "Baseline status." *See id.* § XII(B).

75. A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate a NAL exceedance for that same parameter. *See id.* § XII(C).

76. Level 1 status begins on July 1 following the reporting year in which the exceedance(s) occurred. *Id.* § XII(C). Once Level 1 status commences, permittees must complete the following requirements by October 1: (1) complete an evaluation, with the assistance of a Qualified Industrial Stormwater Practitioner ("QISP"), of the facility's industrial pollutant sources that are or may be related to the NAL exceedance(s); and (2) identify in the evaluation both the corresponding BMPs already in the SWPPP and any additional BMPs or SWPPP revisions necessary to prevent future NAL exceedances and ensure compliance with General Permit requirements. *See id.* §§ XII(C)(1)(a)-(c).

77. Although the evaluation may focus on the drainage areas where the NAL exceedance(s) occurred, all drainage areas shall be evaluated. *See id.* § XII(C)(1)(c).

78. Based on the Level 1 status evaluation, the permittee must complete the following actions as soon as practicable, but no later than January 1 following the commencement of Level 1 status: (1) revise the SWPPP as necessary and implement any additional BMPs identified in the evaluation; and (2) certify and submit via SMARTS a Level 1 ERA Report prepared by a QISP that includes (a) a summary of the Level 1 ERA Evaluation, (b) a detailed description of the SWPPP revisions, and (c) any additional BMPs for each parameter that exceeded a NAL. *See id.* §§ XII(C)(2)(a)(i)-(ii).

79. A permittee in Level 1 status must also certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status. *See id.* § XII(C)(2)(a)(iii).

80. A permittee's Level 1 status for a parameter will return to Baseline status once a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four consecutive QSEs, sampled after BMP implementation, indicate no additional NAL exceedances for that parameter. *Id.* § XII(C)(2)(b).

81. A permittee's Level 1 status for any given parameter shall change to Level 2 status if sampling results indicate a NAL exceedance for that same parameter while the discharger is in Level 1. Level 2 status commences on July 1 following the reporting year during which the NAL exceedance(s) occurred. *Id.* § XII(D).

82. A discharger in Level 2 status shall submit a Level 2 ERA Action Plan, prepared by a QISP, that addresses each new Level 2 NAL exceedance by January 1 following the reporting year during which the NAL exceedances occurred. On January 1 of the reporting year following the submittal of the Level 2 ERA Action Plan, a discharger shall also certify and submit to SMARTS a Level 2 ERA Technical Report prepared by a QISP. *Id.*

83. Dischargers with Level 2 status are required to annually update their Level 2 ERA Technical Reports based upon additional NAL exceedances of the same parameter and same drainage area, facility operational changes, pollutant source(s) changes, and/or information that becomes available via compliance activities. *Id.* § XII(D)(3)(c).

84. Dischargers with Level 2 status who submit one of the above demonstrations and have implemented BMPs to prevent future NAL exceedance(s) for the Level 2 parameter(s) shall return to baseline status for that parameter, if results from four subsequent consecutive QSEs samples indicate no additional NAL exceedance(s) for that

parameter(s). *Id.* § XII(D)(4)(a).

85. If future NAL exceedances occur for the same parameter(s), the Discharger's Baseline status will return to Level 2 status on July 1 in the subsequent reporting year during which the NAL exceedance(s) occurred. *Id.*

**G. The General Permit's Annual Reporting Requirements**

86. General Permit § XVI requires dischargers to submit an Annual Report to the Regional Board by July 15 of each year.

87. The Annual Report must include a compliance checklist that indicates whether a discharger has complied with all of the applicable requirements of the General Permit, including: an explanation for any non-compliance of requirements within the reporting year, an identification, including page numbers and/or sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation. *See id.* § XVI.

88. Annual Reports are certified by the Facility's legally responsible person under penalty of perjury.

**H. The General Permit's Annual Evaluation Requirement**

89. General Permit § XV requires permittees to complete an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") each year.

## V. <u>FACTUAL BACKGROUND</u>

**A. The Facility's General Permit Coverage**

90. Plaintiffs allege that the Facility has had General Permit coverage since at least 2007.

91. Plaintiffs allege that the Facility initially submitted an NOI to SMARTS on June 26, 2015.

92. Plaintiffs allege that the Facility submitted an updated NOI to SMARTS on November 13, 2023 ("2023 NOI"), indicating that the Facility's operator contact and the Facility's contact changed.

93. Per the most recent 2023 NOI, the Facility is located at 3435 S. Riverside Ave, Rialto, California 92316.

94. The 2023 NOI states the Facility consists of 18 acres, with 18 acres of industrial area exposed to storm water.

95. The 2023 NOI fails to indicate what percentage of the Facility is impervious.

96. Per the Facility's most recently updated SWPPP, uploaded to SMARTS on March 11, 2021 ("SWPPP"), the Facility's operating hours are "eight (8) hours a day, five (5) days a week."

97. SMARTS lists the current Facility Waste Discharge Identification ("WDID") number as 8 36I017346.

98. SMARTS lists the Facility's coverage under the General Permit as "Active."

99. The SWPPP states that 68% of the Facility is impervious.

100. The 2023 NOI lists one SIC code for the Facility: 3271.

101. Plaintiffs are informed and believe, and thereon allege, that the Facility must obtain General Permit coverage for the entire Facility. *See id.* § XVII(E)(1).

102. Plaintiffs are informed and believe, and thereon allege, that the owner(s) and/or operator(s) are required to sample storm water for TSS, pH, O&G, and Fe.

**B. Industrial Activities and Pollutant Sources at the Facility**

103. Plaintiffs are informed and believe, and thereon allege, that the Facility conducts off-loading of cement and aggregates into bins and onto a conveyer system to a batch plant.

104. Plaintiffs are informed and believe, and thereon allege, that the Facility performs the following industrial activities: molding concrete, curing concrete, and drying concrete in curing chambers.

105. Plaintiffs are informed and believe, and thereon allege, that the Facility's secondary operations include tumbling of pavers, color weighing, pallet repair, and mold repair.

106. Plaintiffs are informed and believe, and thereon allege, that the Facility also conducts service-related activities including vehicle maintenance, fueling, waste handling, and raw material and finished paver hauling.

107. Plaintiffs are informed and believe, and thereon allege, that additional Facility industrial activities include storage of pavers, tumbler usage, curling chamber usage, mixing, crushing, palletizing, and color storage.

108. Plaintiffs are informed and believe, and thereon allege, that the Facility's additional sources of pollution at the Facility include final product storage, wood pallet storage, diesel storage, raw material piles, and scrap piles.

109. Plaintiffs are informed and believe, and thereon allege, that the areas of industrial activity and industrial activities at the Facility are sources of pollutants.

110. Plaintiffs are informed and believe, and thereon allege, that the owner(s) and/or operator(s) have not properly developed and/or implemented the required BMPs to address the pollutant sources and associated pollutants at the Facility.

111. BMPs are necessary at the Facility to prevent the exposure of pollutants to precipitation and the subsequent discharge of polluted storm water from the Facility during rain events.

112. Plaintiffs are informed and believe, and thereon allege, the owner(s) and/or operator(s)' failure to develop and/or implement required BMPs results in the exposure of pollutants associated with their industrial activities to precipitation, and results in the Facility's discharge of polluted storm water from the Facility into the Receiving Waters in violation of the General Permit and the Clean Water Act.

113. Plaintiffs are informed and believe, and thereon allege, that the Facility's illegal discharges of polluted storm water harm Plaintiffs' members' use and enjoyment of the Receiving Waters by degrading water quality and posing risks to human health and aquatic life.

### C. The Facility's Storm Water Sampling Point and Discharge to the Receiving Waters

114. The Facility's most recent SWPPP, uploaded to SMARTS on March 11, 2021, states that the Facility has two storm water monitoring points, that ultimately discharge to the Santa Ana River.

115. Plaintiffs allege that storm water discharges from the Facility to a storm drain, which discharges into the Santa Ana River, which then flows to the Pacific Ocean.

116. Plaintiffs allege that the Santa Ana River and Pacific Ocean are all waters of the United States.

### D. Defendants' Violations of the General Permit's Requirement for BMPs that Achieve BAT and BCT

117. Plaintiffs are informed and believe, and thereon allege, that the owner(s) and/or operator(s) have not implemented BMPs that achieve BAT/BCT at the Facility.

118. Plaintiffs allege that storm water discharges from the Facility contain concentrations of pollutants associated with the Facility's industrial activities above EPA Benchmarks incorporated into the General Permit as NALs.

119. Plaintiffs allege that storm water discharges from the Facility contain concentrations of pollutants with exceedances of annual NALs.

120. The levels of iron in storm water sampled by the Facility have exceeded the EPA Benchmark and annual NAL for iron of 1.0 mg/L established by the EPA and the State Board, respectively. For example, on March 21, 2023, the owner(s) and/or operator(s) measured a level of iron of 14 mg/L in storm water discharged by one of the Facility's outfalls. That level of iron is 14 times higher than the EPA Benchmark and annual NAL for iron. The owner(s) and/or operator(s) also have measured levels of iron in excess of 1.0 mg/L in nearly every sample they collected from the Facility, including samples collected on December 4, 2019, March 10, 2020, November 8, 2022, January 5, 2023, March 21, 2023, February 5, 2024, and October 14, 2025.

121. The levels of total suspended solids ("TSS") in storm water sampled by the Facility have exceeded the EPA Benchmark and annual NAL for TSS of 100 mg/L established by the EPA and the State Board, respectively. For example, on March 21, 2023, the owner(s) and/or operator(s) measured a level of TSS of 620 mg/L from one of the Facility's outfalls. That level of TSS is over six times higher than the EPA Benchmark and annual NAL for TSS. The owner(s) and/or operator(s) have measured levels of TSS in excess of 100 mg/L in nearly every sample they collected from the Facility including samples collected on December 4, 2019, March 10, 2020, November 8, 2022, March 21, 2023, February 5, 2024, and October 14, 2025.

122. The Permit requires facilities to analyze all storm water samples for parameters that serve as indicators of the presence of all industrial pollutants identified in the SWPPP's pollutant source assessment. Permit § XI.B.

123. On information and belief Waterkeeper alleges that had the Facility conducted a thorough pollutant source assessment, the Facility would have identified and monitored for additional pollutants, including but not limited to zinc ("Zn"), copper ("Cu"), and aluminum ("Al").

124. Plaintiffs allege that the Facility's ongoing discharges of storm water with pollutants in excess of applicable NALs and EPA Benchmarks demonstrate that the Defendants have failed and continue to fail to develop and/or implement BMPs that comply with the General Permit's BAT/BCT standards.

125. Each day that the Defendants fail to develop and implement BAT and BCT at the Facility in violation of the General Permit is a separate and distinct violation of the Clean Water Act.

126. The Defendants have been in violation of the BAT and BCT requirements at the Facility every day since at least November 11, 2020.

**E. Defendants' Violations of the General Permit's Storm Water Pollution Prevention Plan Requirements**

127. The Facility's SWPPP is publicly available via the SMARTS database and is dated March 11, 2021.

128. Plaintiffs are informed and believe, and thereon allege, that the 2021 SWPPP referenced in Paragraph 128 is the current SWPPP for the Facility.

129. Plaintiffs are informed and believe, and thereon allege, that Defendants have failed and continue to fail to adequately develop, implement, and/or revise the Facility's SWPPP in violation of the General Permit's SWPPP requirements.

130. Plaintiffs allege that the SWPPP has not been updated in response to the owner(s) and/or operator(s)'numerous reported NAL exceedances from the 2022-2023, 2023-2024, and 2024-2025 reporting years. General Permit, § X.B. Such revisions could have been warranted even earlier due to NAL exceedances, but the owner(s) and/or operator(s) did not upload any storm water sampling results to SMARTS for the 2020-2021 reporting year.

131. Additionally, for the exceedances the owner(s) and/or operator(s) did report, Defendants failed to upload required ERA documentation to SMARTS that could have then been used as a basis for SWPPP updates.

132. Furthermore, Plaintiffs allege that the SWPPP has not been updated to reflect the change in the Facility's contact information presented in the 2023 NOI.

133. Plaintiffs allege that the SWPPP fails to conduct a full assessment of potential pollutant sources, including the degree to which pollutants associated with those materials may be exposed, and the direct and indirect pathways by which pollutants may be exposed, to storm water. Permit § X(G)(2). For example, Waterkeeper tested the Facility's storm water for pollutants on October 14, 2025, and found exceedances for copper (measured 0.04 mg/L in excess of the EPA's Benchmark and annual NAL limit of 0.0332 mg/L) and aluminum (measured 4.5 mg/L in excess of the EPA's Benchmark and annual NAL limit

of 0.75 mg/L). The Facility must conduct a full assessment of potential pollutant sources to account for its copper and aluminum NAL exceedances.

134. Plaintiffs allege that the SWPPP does not specify procedures to identify alternate Pollution Prevention Team members to implement the SWPPP and conduct required monitoring when the regularly assigned team members are temporarily unavailable. *Id.* § X.D.1.c.

135. Plaintiffs allege that the SWPPP fails to describe the areas protected by containment structures and their corresponding containment capacity. For example, while the SWPPP states that the facility utilizes sandbags to slow down the flow of storm water, there is no mention of the containment capacity of these structures. *Id.* § X(G)(1)(b).

136. Plaintiffs allege that the SWPPP fails to describe the effectiveness of existing BMPs and the estimated effectiveness of implementing minimum BMPs to reduce or prevent pollutants in industrial storm water discharges. *Id.* § X(G)(2).

137. Plaintiffs allege that the SWPPP fails to conduct a proper assessment of Best Management Practices. For example, the Facility does not identify preventative maintenance measures or a specific spill and leak prevention and response. *Id.* § (X)(H)(2).

138. Plaintiffs allege that the SWPPP fails to conduct a full analysis of minimum BMPs. *Id.* § (X)(A).

139. Plaintiffs allege that the SWPPP's site map fails to depict and locate structural control measures. For example, the Site Map does not depict where the catch basins or secondary containment structural control measures are on the Facility, despite noting in the SWPPP that those structural control measures are in place. *Id.* § X(E)(3)(c).

140. Plaintiffs allege that the SWPPP's site map fails to depict shipping and receiving areas. *Id.* § X(E)(3)(f).

141. Each day the Facility has operated with an inadequately developed, implemented, and/or improperly revised SWPPP is a separate and distinct violation of the General Permit and the CWA.

142. Plaintiffs are informed and believe, and thereon allege, that Defendants have been in daily and continuous violation of the General Permit's SWPPP requirements since at least November 11, 2020.

### F. Defendants' Violations of the General Permit's Monitoring Requirements

143. Plaintiffs are informed and believe, and thereon allege, that the owner(s) and/or operator(s) have been conducting, and continue to conduct, operations at the Facility with an inadequately developed, implemented, and/or improperly revised MIP.

144. Precipitation data obtained from the National Oceanic and Atmospheric Administration demonstrates that there were numerous QSEs at the Facility during the past several Reporting Years that the owner(s) and/or operator(s) failed to monitor.

145. Plaintiffs are informed and believe, and thereon allege, that the owner(s) and/or operator(s) have failed and continue to fail to collect and analyze storm water discharge samples from all QSEs at the Facility as required by General Permit § XI(B)(3) as follows:

- Failure to collect and analyze two samples from both sampling points during the first half of the 2020-2021 reporting year.
- Failure to collect and analyze two samples from both sampling points during the second half of the 2020-2021 reporting year.
- Failure to collect and analyze two samples from both sampling points during the first half of the 2021-2022 reporting year.
- Failure to collect and analyze two samples from both sampling points during the second half of the 2021-2022 reporting year.
- Failure to collect and analyze two samples sample from both sampling points during the first half of the 2022-2023 reporting year.
- Failure to collect and analyze two samples sample from both sampling points during the second half of the 2022-2023 reporting year.

- Failure to collect and analyze two samples from both sampling points during the first half of the 2023-2024 reporting year.
- Failure to collect and analyze two samples from both sampling points during the second half of the 2023-2024 reporting year.
- Failure to collect and analyze two samples from both sampling points during the first half of the 2024-2025 reporting year.
- Failure to collect and analyze two samples from the sampling point during the second half of the 2024-2025 reporting year.
- Failure to collect and analyze two samples from both sampling points during the first half of the 2025-2026 reporting year.

146. Plaintiffs are informed and believe, and thereon allege, that the storm water samples that the owner(s) and/or operator(s) collected on January 5, 2023, November 8, 2022, and February 5, 2024, were not from QSEs. On information and belief, Waterkeeper alleges that the Facility's storm water samples collected from the above dates were not QSEs because these dates were not preceded by 48 hours without discharge. Waterkeeper further alleges that, on information and belief, that since the samples from these dates were not from QSEs, the Facility failed to collect and analyze storm water discharges from two of the required QSEs during the 2022-2023 reporting period, and one of the required samples from the 2023-2024 reporting year. Plaintiffs thereon allege that the owner(s) and/or operator(s) have failed and continue to fail to collect and analyze storm water samples from four required QSEs for reporting years 2022-2023 and 2023-2024.

147. Plaintiffs are informed and believe, and thereon allege, that the owner(s) and/or operator(s) have failed to analyze storm water discharges from the Facility for copper since at least November 11, 2020.

148. Plaintiffs are informed and believe, and thereon allege, that the owner(s) and/or operator(s) have failed to collect and analyze the required number of storm water discharges from the Facility's outfall each reporting year since at least November 11,

2020.

149. Plaintiffs are informed and believe, and thereon allege, that the owner(s) and/or operator(s) have failed to analyze storm water samples for all required parameters since at least November 11, 2020.

150. Plaintiffs are informed and believe, and thereon allege, that the owner(s) and/or operator(s) have failed to conduct monthly dry weather visual observations and/or maintain records of such observations, in violation of General Permit § XI(A), since at least November 11, 2020.

151. Plaintiffs are informed and believe, and thereon allege, that the owner(s) and/or operator(s) have failed to conduct and/or document storm water sampling event visual observations from the Facility's discharge location, in violation of General Permit § XI(A), since at least November 11, 2020.

152. Plaintiffs are informed and believe, and thereon allege, that the owner(s) and/or operator(s) have been in daily and continuous violation of the General Permit's MIP requirements since at least November 11, 2020.

153. Plaintiffs are informed and believe, and thereon allege, that the owner(s) and/or operator(s) are in violation of the General Permit and the CWA because they have failed and continue to fail to adequately develop, implement, and/or revise their MIP in violation of the General Permit's MIP requirements.

154. Every day that the owner(s) and/or operator(s) operate with an inadequately developed, revised, and/or implemented MIP is a separate and distinct violation of the General Permit and the CWA.

### G. Defendants' Violations of the General Permit's Exceedance Response Action Requirements

155. Plaintiffs allege that as of November 11, 2025, the Facility owner(s) and/or operator(s) have not complied with the Permit's Exceedance Response Action ("ERA") documentation requirements.

i. <u>Iron Exceedances and Lack of Sufficient ERA Responses</u>

156. Plaintiffs allege that the Facility first entered Level 1 for iron following iron exceedances during the 2017-2018 reporting year.

157. Plaintiffs allege that following the 2019-2020 reporting year, the Facility entered Level 2 for iron following additional iron exceedances.

158. Plaintiffs allege that during the 2020-2021, 2021-2022, 2022-2023, 2023-2024, and 2024-2025 reporting years, the Facility remained in Level 2 for iron.

159. Plaintiffs allege that per the General Permit, the Facility was required to upload a Level 2 Action Plan for iron to SMARTS by January 1, 2021, and a Level 2 Technical Report for iron to SMARTS by January 1, 2022.

160. Plaintiffs allege that each following year, the Facility was required to submit an updated Level 2 ERA Technical Report for iron to SMARTS or certify no changes to their Technical Report in their Annual Report by January 1 of each year.

161. While the Facility submitted four revised Level 2 ERA Technical Reports in response to iron exceedances in the 2017-2018, 2019-2020, 2022-2023, and 2023-2024 reporting years, Plaintiffs allege that the Facility has remained in Level 2 status because of continuous annual exceedances.

162. Moreover, Plaintiffs allege that the Facility has remained in Level 2 status because of its failure to obtain four consecutive QSEs sampled without NAL exceedances for iron. *See* General Permit § XII.D.4.a.

163. Plaintiffs allege that the only years that the Facility has not reported iron exceedances within the five-year statutory period are years in which the Facility failed to report any sampling data.

164. Plaintiffs allege that on June 29, 2020, the Facility submitted a Level 2 ERA Technical Report for iron for the 2019-2020 reporting year. ("2020 Technical Report"). The 2020 Technical Report contained five BMPs to be implemented in the 2020-2021 reporting year along with an updated SWPPP.

165. Plaintiffs allege that on December 29, 2023, the Facility submitted another Level 2 ERA Technical Report for iron exceedances measured during the 2022-2023 reporting year ("2023 Technical Report for Iron"). The 2023 Technical Report for Iron replicated the exact same BMPs as the 2020 Technical Report along with a note to submit an updated SWPPP. No progress on the 2020 BMPs was provided in the 2023 Technical Report for Iron, and no updated SWPPP has been provided since March 2021.

166. Plaintiffs allege that on October 9, 2024, the Facility submitted a Level 2 ERA Technical Report for iron exceedances measured during the 2023-2024 reporting year ("2024 Technical Report for Iron). The 2024 Technical Report for Iron provided an update on the status of the BMPs included in the 2023 Technical Report for Iron, noting that only one of the original five BMPs, namely, the evaluation of iron sampling, had been completed. Two of the original BMPs were marked as "to be dropped from further consideration," while the other two were simply "not implemented" or "not complete." The 2024 Technical Report for Iron lists three additional BMPs to be implemented during the 2024-2025 sampling period along with a revised SWPPP due "within 30 days of selection/installation of the new BMP(s)." Following the 2024 Technical Report for Iron, no revised SWPPP has been submitted, in violation of the General Permit. *See* General Permit § X.B.

ii. <u>TSS Exceedances and Lack of Sufficient ERA Responses</u>

167. On information and belief, Plaintiffs allege that following the 2019-2020 reporting year, the Facility entered Level 2 for TSS.

168. Consequently, Plaintiffs allege that the Facility was required to submit a Level 2 ERA Report for TSS by January 1, 2021, and a Level 2 Technical Report for TSS by January 1, 2022.

169. Plaintiffs allege that on January 28, 2021, the Facility submitted its first Level 2 ERA Plan for TSS. The plan contained five BMPs that were to be implemented during the following reporting year.

170. Plaintiffs allege that on June 29, 2022, the Facility submitted its Level 2 ERA Technical Report for TSS ("2022 Technical Report"), which noted that of the five scheduled BMPs, only two had been completed: providing TSS results to storm water control vendors for recommendations and installing filter socks for TSS. The remaining scheduled BMPs were listed as "if needed, implement by June 30, 2023."

171. Plaintiffs allege that on December 19, 2023, following another TSS exceedance during the 2022-2023 reporting year, the Facility submitted a Revised Level 2 ERA Technical Report for TSS ("2023 Technical Report for TSS"). The 2023 Technical Report for TSS noted that "the effectiveness of many tasks proposed in Section 5.2 was not evaluated until the 2022-2023 reporting year, and some planned tasks in Table 5-2 were not able to be implemented." The 2023 Technical Report for TSS then listed eight tasks, some of which carried over from the 2022 Technical Report, and some of which were new.

172. Plaintiffs allege that following another TSS exceedance in the 2023-2024 reporting year, the Facility remained in Level 2 status for TSS. As a result, the Facility was again required to submit an updated Level 2 ERA Technical Report for TSS or certify no changes to their Technical Report in their Annual Report by January 1, 2025. While the Facility submitted a Level 2 ERA Technical Report for TSS in October 2024, it failed to submit four consecutive TSS measurements below the NAL and retained its Level 2 status.

173. The Level 2 Technical Report for TSS uploaded to SMARTS on October 10, 2024 ("2024 Technical Report for TSS") noted that only one task listed in the 2023 Technical Report for TSS had been completed: "the evaluation of TSS sampling data." The remaining BMPs were either "not implemented" or "incomplete." Moreover, the 2024 Technical Report for TSS noted that an updated SWPPP, which is required after the selection of any new BMPs, was "In Process." The required SWPPP update has still not been submitted, in violation of the General Permit.

174. Plaintiffs are informed and believe, and thereon allege, that the owner(s) and/or operator(s) have been in daily and continuous violation of the General Permit Exceedance Response Actions requirements since at least November 11, 2020.

175. Plaintiffs are informed and believe, and thereon allege, that every day the Facility operates without timely submitting and implementing all required ERA documentation is a separate and distinct violation of the General Permit and the Clean Water Act.

**H. Defendant's Violations of the General Permit's Reporting Requirements**

176. Plaintiffs allege that for the past five years, the owner(s) and/or operator(s) have failed to submit Annual Reports that comply with General Permit § XVI's reporting requirements.

177. Plaintiffs allege, on information and belief, that in the Facility's 2019-2020 Annual Report, Mr. David Wilson ("Mr. Wilson") falsely certified that the Facility failed to take all required samples because an insufficient number of QSEs occurred during the 2019-2020 reporting year. On information and belief, Plaintiffs allege that multiple QSEs occurred during that reporting year that the Facility could have sampled to fulfill Permit requirements.

178. Plaintiffs allege, on information and belief, that in the Facility's 2020-2021 Annual Report, Mr. Wilson falsely certified that the Facility failed to take all required samples because an insufficient number of QSEs occurred during the 2020-2021 reporting year. On information and belief, Plaintiffs allege that multiple QSEs occurred during that reporting year that the Facility could have sampled to fulfill Permit requirements.

179. Plaintiffs allege that in the Facility's 2021-2022 Annual Report, Mr. Matthew Richmond falsely certified that the Facility failed to take all required samples because an insufficient number of QSEs occurred during the 2021-2022 reporting year. On information and belief, Plaintiffs allege that multiple QSEs occurred during that reporting year that the Facility could have sampled to fulfill Permit requirements.

180. Plaintiffs allege that in the Facility's 2022-2023 Annual Report, Mr. James Schenck falsely certified that the Facility failed to take all required samples because an insufficient number of QSEs occurred during the 2022-2023 reporting year. On information and belief, Plaintiffs allege that multiple QSEs occurred during that reporting year that the Facility could have sampled to fulfill Permit requirements.

181. Plaintiffs allege that in the Facility's 2023-2024 Annual Report, Mr. Matthew Richmond falsely certified that the Facility failed to take all required samples because an insufficient number of QSEs occurred during the 2023-2024 reporting year. On information and belief, Plaintiffs allege that multiple QSEs occurred during that reporting year that the Facility could have sampled to fulfill Permit requirements.

182. Plaintiffs allege that in the Facility's 2024-2025 Annual Report, Mr. Matthew Richmond falsely certified that the Facility failed to take all required samples because an insufficient number of QSEs occurred during the 2024-2025 reporting year. On information and belief, Plaintiffs allege that multiple QSEs occurred during that reporting year that the Facility could have sampled to fulfill Permit requirements.

183. Plaintiffs are informed and believe, and thereon allege, that the owner(s) and/or operator(s) have been in daily and continuous violation of the General Permit's reporting requirements since at least November 11, 2020.

184. Plaintiffs are informed and believe, and thereon allege, that every day the Facility conducts operations without reporting as required by the General Permit is a separate and distinct violation of the General Permit and the CWA.

## VI. CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Violations of CWA § 301(a) by Discharging Contaminated Storm Water in Violation of the General Permit's Requirement for BMPs that Achieve BAT and BCT**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

185. Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

186. Plaintiffs are informed and believe, and thereon allege, that Defendants have failed and continue to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT in violation of General Permit § V(A) (Effluent Limitation) and the CWA, 33 U.S.C. § 1311(b). Defendants' failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a daily violation of the General Permit and the CWA. General Permit, § V(A); 33 U.S.C. § 1311(b).

187. Each day since November 11, 2020, that Defendants have failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and CWA § 301(a), 33 U.S.C. § 1311(a).

188. Defendants have been in violation of the BAT/BCT requirements every day since November 11, 2020. Defendants continue to be in violation of the BAT/BCT requirements each day that they fail to develop and fully implement BAT/BCT at the Facility.

## SECOND CAUSE OF ACTION

**Defendants' Failure to Adequately Develop, Implement, and/or Revise a Storm Water Pollution Prevention Plan ("SWPPP") in Violation of the General Permit**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

189. Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

190. Plaintiffs are informed and believe, and thereon allege, within the applicable statute of limitations, that Defendants have failed and continue to fail to develop, implement, and/or revise an adequate SWPPP for the Facility, in violation of the General Permit.

191. Defendants have failed to update the SWPPP for the Facility in response to the analytical results of the Facility's storm water monitoring.

192. Each day since November 11, 2020, that Defendants have failed to develop, implement and update an adequate SWPPP for the Facility is a separate and distinct violation of the General Permit and CWA § 301(a), 33 U.S.C. § 1311(a).

193. Defendants have been in violation of the General Permit's SWPPP requirements every day since November 11, 2020. Defendants continue to be in violation of the SWPPP requirements each day that they fail to develop and fully implement an adequate SWPPP for the Facility.

## THIRD CAUSE OF ACTION

**Defendants' Failure to Adequately Develop, Implement, and/or Revise a Monitoring Implementation Plan ("MIP") and Perform Required Monitoring in Violation of the General Permit and the Clean Water Act**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

194. Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

195. Plaintiffs are informed and believe, and thereon allege, within the applicable

statute of limitations, that Defendants have failed and continue to fail to develop, implement, and/or revise an adequate MIP and monitoring program for the Facility, in violation of the General Permit.

196. Defendants' ongoing failure to develop, implement, and/or revise an adequate MIP and monitoring program is evidenced by, *inter alia*, Defendants' failure to collect and analyze samples from all required QSEs.

197. Defendants have been in violation of the General Permit's monitoring requirements for the Facility every day from November 11, 2020 to the present.

198. Defendants will continue to be in violation of General Permit § X(I) and the CWA each day they fail to adequately develop, implement, and/or revise the MIP for the Facility.

199. Each day, since at least November 11, 2020, that Defendants fail to develop, implement and/or revise an adequate MIP and monitoring program for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and CWA § 301(a), 33 U.S.C. § 1311(a). The absence of requisite monitoring and analytical results are ongoing and continuous violations of the CWA.

## FOURTH CAUSE OF ACTION

### Defendants' Failure to Comply with the General Permit's Requirement for Exceedance Response Actions ("ERA")

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

200. Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

201. Defendants have failed to submit all required ERA documentation throughout the relevant statute of limitations period.

202. Each day, since at least November 11, 2020, that Defendants fail to comply with the ERA requirements in the General Permit for the Facility is a separate and distinct violation of the General Permit and CWA § 301(a), 33 U.S.C. § 1311(a). This is an

ongoing and continuous CWA violation.

## FIFTH CAUSE OF ACTION

**Defendants' Failure to Comply with the General Permit's Requirements for Annual Reports**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

203. Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

204. Defendants have consistently failed to submit Annual Reports that comply with the General Permit § XVI requirements.

205. Each day since at least November 11, 2020, that Defendants fail to prepare and submit adequate Annual Reports for the Facility is a separate and distinct violation of the General Permit and CWA § 301(a), 33 U.S.C. § 1311(a). This is an ongoing and continuous CWA violation.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth hereafter and respectfully request that this Court grant the following relief:

a. Declare Defendants to have violated and to be in violation of the CWA as alleged herein;

b. Enjoin Defendants from discharging polluted storm water from the Facility unless authorized by the General Permit;

c. Enjoin Defendants from further violating the substantive and procedural requirements of the General Permit;

d. Order Defendants to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT;

e. Order Defendants to immediately implement storm water pollution control and treatment technologies and measures that prevent pollutants

in the Facility's storm water from contributing to violations of any water quality standards;

f. Order Defendants to comply with the General Permit's MIP requirements;

g. Order Defendants to prepare a SWPPP for the Facility consistent with the General Permit's requirements and implement procedures to regularly review and update the Facility's SWPPP;

h. Order Defendants to provide Plaintiffs with reports documenting the quality and quantity of the Facility's discharges to waters of the United States and its efforts to comply with the CWA and the Court's orders;

i. Order Defendants to prepare and submit adequate ERA reports;

j. Order Defendants to prepare and submit adequate Annual Reports;

k. Order Defendants to pay civil penalties of up to $68,445 per day per violation, pursuant to CWA §§ 309(d) and 505(a), 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §19.4 (as amended, January 8, 2025);

l. Order Defendants to take appropriate actions to restore the quality of waters impaired or adversely affected by its activities;

m. Award Plaintiffs' costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the CWA, 33 U.S.C. § 1365(d); and,

n. Award any such other and further relief as this Court may deem appropriate.

Dated: January 12, 2026

Respectfully submitted,

Clair Leonard
Attorney for Plaintiffs
Inland Empire Waterkeeper and Orange County Coastkeeper